## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
## SAVANNAH DIVISION

ROBERT LESLIE FALLIN,     )
                          )
      Plaintiff,      )
                          )
v.                       )       CV417-146
                          )
MEG HEAP, *et al.*,       )
                          )
      Defendants.    )

## ORDER AND REPORT AND RECOMMENDATION

Proceeding *pro se*, Robert Leslie Fallin brings this 42 U.S.C. § 1983 action against various state officials, a municipal entity, and a private citizen involved in his arrest and prosecution.[1]  Doc. 1.  The Court now screens the Complaint pursuant to 28 U.S.C. § 1915A,[2] which requires the

---

[1]  In his Complaint, Fallin names District Attorney Meg Heap, "prosecutor Margaret," Judges Timothy R. Warmsley (sic) and Penny Haas Freesemann (sic), Public Defender Michael Kelly, Sheriff John Wilcher, Psychologist Dr. Jennifer Rohrer, and Doe defendant sheriff's staff officers "who removed [him] from the veterans' dorm."  Doc. 1 at 4.

[2]   District courts have the inherent power to dismiss *sua sponte* frivolous lawsuits, even those where the plaintiff pays the full filing fee.  *See Cuyler v. Aurora Loan Services, LLC*, 2012 WL 10488184 at * 2 (11th Cir. 2012) (notwithstanding filing fee payment, "a district court has the inherent authority to dismiss a patently frivolous complaint"); *Jefferson Fourteenth Assocs. v. Wometco de Puerto Rico, Inc.*, 695 F.2d 524, 526 n.3 (11th Cir. 1983) (noting that courts may *sua sponte* dismiss actions for lacking merit "if the proper procedural steps are taken and if the determination is correct on the merits"); *Wilkerson v. Georgia*, 2014 WL 3644179 at * 1 (S.D. Ga. July

immediate dismissal of any *pro se* complaint that fails to state at least one

actionable claim.[3]

## I.   BACKGROUND

Fallin alleges, unedited and in full, that

> Prosecutor submitted false police report to Recorder's court, Michael
> Kelly Failed to raise objection, though he knew report walse false,
> Medical has refused to provide CPAP machine for my sleep apnea.
> District Attorney admitted I am being prosecuted for political
> reasons, rather than accepting original recommendation of
> probation.  D.A. likely suborned perjury from several SWAT team
> members when they submitted their after-action reports.  D.A.
> inflated simple battery charge to "Handicap abuse" because the
> victim is a woman.  Dr. Rohrer conspired with Judge Freesemann to
> delay my psychological evaluation, then submitted an incomplete
> evaluation with prejudicial conclusions.  Judges Freesemann and
> Warmsley ordered me to pay 90% to 100% of my income to my wife,
> making it impossible for me to be released on bail.

> I accuse the above-named defendants of racketeering, conspiracy,
> obstruction of justice, sex discrimination or retaliation for my
> exercise of free speech and petition, along with mail tampering to
> hinder execution of my complaints.   I respectfully request my
> complaints be investigated by the US Attorney for South Georgia.

Doc. 1 at 5-6.  This is an interesting new take on his underlying criminal

---

21, 2014) (dismissing pro se complaint on frivolity grounds even though plaintiff paid
full filing fee), *rev'd on other grounds by* 618 F. App'x 610 (11th Cir. 2015).

[3]  Because the Court applies Fed. R. Civ. P. 12(b)(6) standards in screening a complaint
pursuant to § 1915A, *Leal v. Ga. Dep't of Corr.*, 254 F.3d 1276, 1278-79 (11th Cir. 2001),
allegations in the Complaint are taken as true and construed in the light most
favorable to the plaintiff.  *Bumpus v. Watts*, 448 F. App'x 3, 4 n.1 (11th Cir. 2011).
Conclusory allegations, however, fail.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)
(discussing a Rule 12(b)(6) dismissal).

prosecution that contradicts the scenario he previously submitted to this Court, under oath. As set forth in *Fallin v. Flood*, 2017 WL 6758396 (S.D. Ga. Dec. 5, 2017), Fallin's arrest for domestic violence was actually more explosive than indicated here:

> 3 Savannah Chatham Metro Police responded to my wife Millie Fallin's 911 call. Millie told them that she was afraid to go home because she and I had an argument; and that I had threatened to kill her and the police. She told them I was sleeping, but that I had a loaded shotgun by the bed. Police took no security precautions and came over to my partially open front door. Something woke me up and removed my CPAP mask, which prevents me from hearing all but the very loudest sounds. I called for Millie through the partially shut bedroom door, but heard no response. At that time I saw my front door was partially open, peering through shut blinds, I saw a man, upper torso, dressed in a yellow-green rain jacket with no visible markings, as all I could see was the left sleeve. Since my wife never leaves the door unlocked, much less open, I thought she had complained to her bar buddies at Rachel's 1190 that I had hit her lightly on the head and, accidentally, on the shoulder after she threated to tell police I hit her when I had not touched her, then yelled, "He hit me!" loud enough for neighbors to hear. I kept the loaded shotgun next to the bed after Millie called the police a few years earlier and claimed someone had come to our porch and pointed a gun at her.
>
> In any event, I saw the would be intruder push the door further open after I went over to pick up the shotgun, I did not realize until then the man at the door was a police officer, as I saw "Police" on the back of his rain jacket as he and two other police officers ran, I lowered, then put down the shotgun, went to the front door, unarmed and making no attempt to conceal myself, examined the front door, waited for police to call, then shut and locked the front door and went back to sleep. Rather than keep my apartment under surveillance (so they would have seen me at the front door), the

officers called in a S.W.A.T. team. While I slept, the S.W.A.T. team position a small robot outside my front door. The robot had an arm and a video camera. Also, during the time I had brandished the shotgun, I must have popped the window shade, as it was open. So the robot and the S.W.A.T. team had a clear view that I was asleep and <u>not</u> a threat, should officers have approached my window and arrested me at gun point.

Instead, I awake and pull off my CPAP mask to the sound of a bull horn and the sight of a tracked robot with a video camera. I was irate. I initially refused to come out because of the unreasonable force being used, as I feared I would be injured or worse. However, after less than two minutes of negotiating, the small robot smashed my window, pelting me with glass. I screamed a protest, which was <u>not</u> presented in court (nor was the robot video), and the robot began battering at my front door. Panicking, I picked up the shotgun, unloading it into the robot. I then threw a can of bacon grease onto the robot treads to foul them, in case the robot was not completely dead. But it did <u>not</u> move. I then laid back down, put on my mask and went back to sleep. Rather than arrest me, those who removed the robot let me sleep, even though I was now readily accessible through the broken window.

Once again, I awoke to the bull horn. Taking off my mask, I screamed at the negotiator about how the robot had smashed my window. However, after about one minute, I agreed to get on the house phone. However, just as I made contact with the negotiator, the S.W.A.T. team began firing C.S. tear gas into my apartment. Furious, I disconnected the phone and went back and lay on the bed. Before I could put on my mask, a ferret round passed about 1 ½ inches from my abdomen. I calmly went to the bathroom, wiped my face with a wet towel, put on my CPAP mask and went to sleep.

By their own admission, S.W.A.T. inserted enough CS tear gas to kill me many times over. Since CS tear gas is also flammable, the SWAT team could, conceivably, burn down the building or a large portion of the apartment complex.

I slept until the police shut off power to my apartment. As I removed my mask, I began hearing what I thought was lethal small arms.

I gathered weapons and fired into the ground approximately 3 feet beyond the sidewalk in front of my apartment, but clearing the bushes. This was suppression fire, because I did not want anyone hurt while trying to rush my apartment. Likewise, I used taunting to encourage extreme caution. However, while executing suppression fire, I made no attempt to conceal myself. Yet, sharpshooters never shot me.

I was confused and disheartened; as I believed I had done everything possible to delay arrest until cooler heads prevailed, so I could avoid losing my life. Finally, I chose suicide by cutting my brachial arteries with a 6" butcher knife. I chose this form of suicide because I thought I would have more control of my death.

However, I decided it took more courage to live than to die. But, before I could put away the knife, a large police robot broke through my front door and started approaching me. I sensed danger; and I began cutting wires on the robot. Turns out, the robot was equipped with a shotgun shell to blow off my face and an explosive charge "to breach the door". Since the small robot could have breached the door, the 500 pound large robot certainly could. Thus, the purpose of the explosive charge was to cover up the evidence that I had been murdered by the shotgun shell.

The raid was illegal, the S.W.A.T. team commander knew it; and, had I surrendered any time earlier in the raid, I would have been "accidentally" shot.

Clearly, the District Attorney's office realized the raid was an illegal "home invasion." Thus, the D.A. and prosecutor used every effort to deny me Veteran's Court. This included enlisting Dr. Jennifer Rohrer in denying I had previously undiagnosed PTSD. For this, she likely conspired with Superior Court Judge Penny Freesemann. Superior Court Judge Timothy Warmsley also likely conspired, dragging my wife Millie's psychological evaluation until

after I was convicted.  Judge Warmsley also illegally ordered Georgia Heritage Credit Union to dispense funds from my personal savings account (not a joint account).  Sheriff John Wilcher's deputies delivered protective orders which stripped me of my income without due process.  Not surprising, as this case could involve a huge lawsuit, arrest of law enforcement, the D.A.'s office and Superior Court judges.  Damages to Chatham County revenue could run into the hundreds of millions.

-     -     -

Sheriff Wilcher used a "separation form" to "legally" remove the banker, who died under mysterious circumstances ("apparent suicide") in the fall of 2016.  He also almost succeeded with me on Oct 28, 2017.  I had been moved after over a week alone, into a room with a roommate who intimidated me over my snoring.  Had I insisted I be moved, Corporal Metter said he would have to fill out a "separation form" and BOTH of us would have been moved OUT of the Veteran's pod, even though I was the victim.  Outside the Veteran's pod, I would have probably been found "an apparent suicide."

"While I would like to move to another room, if possible, because of the incidents that occurred last night, I am more concerned that David Jackson was standing near Officer Morrell when I told him about my concerns about my roommate, and I asked for his advice. I placed a counselor request for advice."

The incident I describe above began on Thursday.  My roommate first complained about my card shuffling for the first time several days after I entered the room.  This was in the middle of the day; but, my roommate, Mr. Johnson, sleeps most of the time.  He has sleep apnea, as do I, and snores loudly as do I.  However, while I have never complained about his snoring, on Friday in the late afternoon, in an angry voice, Mr. John ordered me to turn on my side and said I belonged in a single room in 1D, the mental area of the jail.  I reported this to Officer Morrel and asked for his advice. Officer Morrel suggested I contact the counselor.  However, another inmate overheard my conversation and told Mr. Johnson I was

trying to get him thrown out of the dorm.  Saturday morning about
2AM, Mr. Johnson rapped his can so hard against the wall of the
cell, he woke me from a sound sleep; and I did not go back to sleep
all night.  I reported this to officer Morrell.  Mr. Johnson was called
out to the hub; however, no disciplinary action was taken against
him.  Later, after I began the note to Corporel Metzler, he stopped
by my cell and told me the watch sergeant had rejected my move;
and that all Corporal Metzler could do was fill out a formal move
request and have <u>both</u> <u>me</u> and Mr. Johnson removed from the dorm.
Sunday morning, I was in too much pain from my back for cleanup;
Mr. Johnson angrily insisted I get up; and I screamed in agony
trying to do back exercises to comply with his demand.

*Fallin v. Flood*, 2017 WL 6758396 at * 1-3 (S.D. Ga. Dec. 5, 2017) (quoting

CV417-216, doc. 1 at 5-18).  The Court there analyzed Fallin's Complaint

at length, ultimately dismissing any claims for illegal search and seizure,

excessive force, malicious prosecution, and an Eighth Amendment claim

for failure to protect from another inmate.  *Fallin*, 2017 WL 6758396 at

*3 (characterizing his nonsensical Complaint as setting forth, at best, a

non-starter claim of "*nappus interruptus*").

## II.   ANALYSIS

Fallin's revived claims of malicious prosecution, "against the

district attorney who indicted him or the superior court judges who

allegedly 'conspired' to violate his rights," remain dead on arrival.  *See*

*Fallin*, 2017 WL 6758396 at *4.  As is his newly-mentioned gripe with

defense counsel and the court-appointed psychologist.   Judges, like

Judges Freesemann and Walmsley, are *absolutely immune* from civil liability for acts taken pursuant to their judicial authority, *see, e.g., Forrester v. White*, 484 U.S. 219, 227-29 (1988), even when the judicial acts are done *maliciously* or *corruptly*. *Stump v. Sparkman*, 435 U.S. 349, 356 (1978); *Harris v. Deveaux*, 780 F.2d 911, 914 (11th Cir. 1986). Non-judicial persons who fulfill a quasi-judicial role at the court's request, like court-appointed psychologists, enjoy quasi-judicial immunity from suit as "arms of the court" performing "functions essential to the judicial process." *E.g., McArdle v. Tronetti*, 961 F.2d 1083 (3d Cir. 1992) (prison doctor who conducted a psychiatric exam on an inmate at the request of the court had absolute judicial and witness immunity); *Moses v. Parwatikar*, 813 F.2d 891 (8th Cir. 1987) (court-appointed psychiatrist entitled to absolute judicial and witness immunity for his role in a competency evaluation); *see generally Briscoe v. LaHue*, 460 U.S. 325, 328 (1983) (witnesses in a criminal action also enjoy absolute witness immunity).

District attorneys and prosecutors too are immune from § 1983 liability where their alleged malfeasance stemmed entirely from their "function as advocate." *Jones v. Cannon*, 174 F.3d 1271, 1281 (11th Cir.

1999) ("[A]bsolute immunity extends to a prosecutor's 'acts undertaken . . . in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State. . . .'"); *see Imbler v. Pachtman*, 424 U.S. 409, 431 (1976); *Jackson v. Capraun*, 534 F. App'x 854, 859 (11th Cir. 2013) (prosecutor entitled to absolute immunity for initiating prosecution even if he did so with malicious intent).   And defense counsel, whether court-appointed or privately retained, does not qualify as a state actor for purposes of § 1983 liability. *Polk County v. Dodson*, 454 U.S. 312, 318 n. 7 (1981) ("[A] lawyer representing a client is not, by virtue of being an officer of the court, a state actor 'under color of state law' within the meaning of § 1983."); *Pearson v. Myles*, 186 F. App'x 865, 865 (11th Cir. 2006) (court-appointed defense counsel did not act under color of state law and thus was not subject to liability under § 1983); *Deas v. Potts*, 547 F.2d 800, 800 (4th Cir. 1976) ("A private attorney who is retained to represent a criminal defendant is not acting under color of state law."), *cited in Robinson v. Bernie*, 2007 WL 80870 at *1 (S.D. Ga. Jan. 8, 2007).[4]

---

[4]   To the extent plaintiff seeks to bring a legal malpractice claim against his public defender, such a claim is governed by state law and must be brought in state court. *See e.g., Diaz v. Sheppard*, 85 F.3d 1502, 1505 (11th Cir. 1996) (federal law does not provide a cause of action for legal malpractice); *Ray v. Tenn. Valley Auth.*, 677 F.2d

Even if he had named an individual susceptible to suit, of course, any malicious prosecution claim requires that the underlying criminal case be terminated in Fallin's favor. *Wood v. Kesler*, 323 F.3d 872, 882 (11th Cir. 2003.  As explained in this Court's order dismissing his prior malicious prosecution claims, there is no allegation that the Chatham County criminal case was resolved in Fallin's favor. *See Fallin*, 2017 WL 6758396 at * 4; *Georgia v. Fallin*, CR16-0749 ("closed" with guilty plea entered for five felony counts of aggravated assault on a peace officer, one felony count of interference with government property, and one felony count of abuse of an elderly/disabled individual).  As Fallin well knows, he can bring no claim for malicious prosecution absent a showing of such relief. *See Fallin v. Wilcher*, SPCV17-01068 (Chatham Cty. Habeas Ct.) ("open" with a show cause hearing held on December 18, 2018).[5]

---

818, 825 (11th Cir. 1982) (federal courts lack jurisdiction over legal malpractice under state law because diversity is lacking and the claim does not present a federal question).

[5]  "[A] prisoner in state custody cannot use a § 1983 action to challenge the fact or duration of his confinement. . . .  He must seek federal habeas corpus relief (or appropriate state relief) instead." *Wilkinson v. Dotson*, 544 U.S. 74, 78 (2005) (quotes and cites omitted); *Heck*, 512 U.S. at 481 (1994) ("[H]abeas corpus is the exclusive remedy for a state prisoner who challenges the fact or duration of his confinement and seeks immediate or speedier release, even though such a claim may come within the literal terms of § 1983.").  And before he can bring a federal habeas action, he must first exhaust his available state remedies through either a direct appeal or another petition for state collateral relief. *Wilkinson*, 544 U.S. at 79 (federal "habeas corpus

The only new claims set forth in Fallin's Complaint, indeed, have to do with being removed from the "Veterans' dorm" and, perhaps, something about his access to his CPAP machine.  Doc. 1 at 5.  Though these threadbare claims warrant dismissal for failing to meet the most basic pleading standard,  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)) (while detailed factual allegations are not required, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  The Federal Rules "demand[ ] more than an unadorned, the-defendant-unlawfully-harmed-me accusation[;]" the complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"), they also fail on the merits.

After all, "the Constitution does not require elaborate prisoner classification at the jail level." *Jones v. Diamond*, 594 F.2d 997, 1016 (5th Cir. 1979) (explaining that, "[n]ot having been convicted, pretrial detainees are all on the same footing and, in the absence of some special circumstance, are entitled to no different treatment than that accorded to

---

actions require a petitioner fully to exhaust state remedies, which § 1983 does not"); 28 U.S.C. §§ 2254(b), (c).

others in the same class."), *on reh'g*, 636 F.2d 1364 (5th Cir. 1981).  Indeed, "classification is confided to the sound discretion of prison officials, under state law."  *Id*.  A change in the level of custody within a prison system does not infringe upon or implicate a liberty interest within the meaning of the Due Process Clause.  *See Moody v. Daggett*, 429 U.S. 78, 88 n. 9 (1976) (prison officials have full discretion to control conditions of confinement, including prisoner classification); *Kramer v. Donald*, 286 F. App's 674, 676 (11th Cir. 2008) (no constitutionally protected liberty interest in being classified at a certain security level or housed in a certain prison).  "[O]nly when the officials fail to protect prisoners from homosexual attacks, personal violence, or unnecessary contact with the contagiously ill" should the federal courts interfere.  *Id*.  Here, Fallin complains that he has been removed from the veterans' dormitory and, perhaps, has lost the privileges incumbent with such classification.  That decision, made for security, punitive, or other reasons, is well within their discretion and, given that he has shown nothing but his own displeasure at the move, "the federal courts are [not] warranted in entering the classification picture."  *Jones*, 594 F.2d at 1016.  Any misclassification claim should be dismissed.

Even less can be discerned about his complaint contending that he has been deprived of use of a sleep apnea CPAP machine. To succeed on an Eighth Amendment claim of deliberate indifference, a plaintiff must show that (1) he had a serious medical need; (2) defendants were deliberately indifference to that need; and (3) some injury was caused by defendants' indifference. *Goebert v. Lee Cty.*, 510 F.3d 1312, 1326 (11th Cir. 2007). Given Fallin's history, he clearly values using a CPAP machine to nap. *See Fallin*, 2017 WL 6758396. But his preference and perceived need do not establish either a serious medical need for one, or any defendant's subjective awareness and disregard of a substantial risk of serious harm flowing from that deprivation. *Ganstine v. Sec'y, Fla. Dep't of Corrs.*, 502 F. App'x 905, 909 (11th Cir. 2012). A difference in medical opinion between a doctor and an inmate as to the inmate's diagnosis or course of treatment, after all, does not establish deliberate indifference. *See Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989). Nothing about Fallin's treatment by prison officials rises to an Eighth Amendment claim here.[6]

---

[6] Any false imprisonment, malicious prosecution, misclassification, or denial of adequate medical care claim against Sheriff Wilcher too fails, no matter how liberally the Court construes Fallin's allegations. In addition to the substantive elements,

Though a *pro se* prisoner normally should be given an opportunity to amend his complaint at least once, *see, e.g., Johnson v. Boyd*, 568 F. App'x 719, 724 (11th Cir. 2014); *Duff v. Steub*, 378 F. App'x 868, 872 (11th Cir. 2010), "a district court need not allow amendment if the amended complaint would still be subject to dismissal." *Jenkins v. Walker*, 620 F. App'x 709, 711 (11th Cir. 2015). To the extent Fallin lobs the most egregious crimes he can conceive of at the state actors who ensured his incarceration — after, it must be remembered, threatening his wife and police with violence, attacking and, perhaps, destroying multiple SWAT team robots, and *laying down "suppression fire" at SWAT team officers* — the Court will not permit frivolous amendments to flesh out his fantastical thoughts on these state actors' "racketeering, conspiracy, obstruction of justice, sex discrimination or retaliation" charges.

---

§ 1983 claims require an allegation of a causal connection between a defendant's acts or omissions and the alleged constitutional deprivation. *See Zalter v. Wainwright*, 802 F.2d 397, 401 (11th Cir. 1986). Such claims cannot be based upon theories of *respondeat superior* or vicarious liability. *See Polk Cnty. v. Dodson*, 454 U.S. 312, 325 (1981); *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 691 (1978); *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990). Fallin's Complaint does not include *any* allegation connecting Sheriff Wilcher to his allegedly tortious arrest and confinement beyond merely listing his name on the case caption. That's not enough to state a claim. *See, e.g., Ashcroft* 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to state a claim upon which relief can be granted).

Plaintiff's claims are dead on arrival, and do not appear amendable.

## III.  CONCLUSION

In sum, Fallin's Complaint should be **DISMISSED** for failure to state a claim upon which relief can be granted.[7]  This R&R is submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 72.3.  Within 14 days of service, any party may file written objections to this R&R with the Court and serve a copy on all parties.  The document should be captioned "Objections to Magistrate Judge's Report and Recommendations."  Any request for additional time to file objections should be filed with the Clerk for consideration by the assigned district judge.

After the objections period has ended, the Clerk shall submit this R&R together with any objections to the assigned district judge.  The district judge will review the magistrate judge's findings and

---

[7]  Although the Court sees no apparent basis upon which the deficient claims could be amended, plaintiff's opportunity to object to this R&R within 14 days affords him an opportunity to resuscitate them.  He may submit an Amended Complaint during that period if he believes it would cure the legal defects discussed above.  *See Willis v. Darden*, 2012 WL 170163, at * 2 n.3 (S.D. Ga. Jan. 19, 2012) (citing *Smith v. Stanley*, 2011 WL 1114503, at * 1 (W.D. Mich. Jan. 19, 2011)).  To state a claim, however, plaintiff must be able to both plead the requisite elements of a § 1983 claim *and* identify a defendant who is not immune from suit.  Fallin is reminded, however, that merely laundry listing grievances, without any accompanying factual details, does not entitle a prisoner to relief.

recommendations pursuant to 28 U.S.C. § 636(b)(1)(C).  The parties are advised that failure to timely file objections will result in the waiver of rights on appeal.  11th Cir. R. 3-1; *see Symonett v. V.A. Leasing Corp.*, 648 F. App'x 787, 790 (11th Cir. 2016); *Mitchell v. United States*, 612 F. App'x 542, 545 (11th Cir. 2015).

**SO ORDERED AND REPORTED AND RECOMMENDED**, this 24th day of April, 2019.

_____
CHRISTOPHER L. RAY
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA